# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**NEIL WILLIAMS,**

**Petitioner,**

**v.**                                                                     **Civil Action No. 2:06cv124**
                                                                          **(Judge Maxwell)**

**THOMAS MCBRIDE, Warden,**

**Respondent.**

## OPINION/REPORT AND RECOMMENDATION

On December 27, 2006, the *pro se* petitioner filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. Petitioner paid the required filing fee on January 22, 2007. On January 24, 2007, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Thus, the Respondent was directed to show cause why the petition should not be granted.

On March 22, 2007, the respondent filed an Answer and a Motion for Summary Judgment. Consequently, the court issued a <u>Roseboro</u> Notice on March 29, 2007, which advised the petitioner of his right to file a response. The petitioner filed a reply on April 10, 2007, to which the respondent filed a response on April 23, 2007.

This case is before the undersigned for a report and recommendation on the respondent's motion for summary judgment.

## I.    Petitioner's State Court Proceedings

### A.    Petitioners' Conviction and Sentence

According to the pleadings, on September 14, 1998, the Ohio County Grand Jury returned

an indictment charging the petitioner with seventeen counts of Third Degree Sexual Assault (Counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33); five counts of Photographing a Minor in Sexually Explicit Conduct (Counts 40, 41, 42, 43, 52); three counts of Sexual Abuse by a Custodian (Counts 45, 47, 49); one count of Sexual Abuse in the First Degree (Count 48); nineteen misdemeanor counts of Sexual Abuse in the Third Degree (2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 44, 46); and seven misdemeanor counts of Exhibition of Obscene Material to a Minor (Counts 35, 36, 37, 38, 39, 50, 51).

By Order entered December 4, 1998, the petitioner pleaded guilty and was convicted of Counts 1, 2, 5, 7, 9, 11, 13, 15, 39, 45, 47, 48 and 52. Resp't Ex. 2. The remaining charges were dismissed. Id.

On February 3, 1998, the petitioner was sentenced to the penitentiary for one to five years on Counts 1, 3, 5, 7, 9, 11 and 15; ten to twenty years on Counts 45 and 47; one to ten years on Count 52; one to five years on Count 48; ninety days on Count 2; and six months on Count 39. In total, the petitioner's aggregate sentence was 28-80 years. However, Counts 45 and 47 were subsequently corrected to not less than five to not more than 15 years. Thus, the petitioner's corrected aggregate sentence was 18-70 years.

**B.  Petitioners' Direct Appeal**

On January 18, 2000, the petitioner appealed his conviction and sentence to the West Virginia Supreme Court of Appeals ("WVSCA") raising the following assignments of error:

1.  The trial court erred by failing to dismiss the constitutionally infirm indictment because it failed to name or otherwise identify the alleged victim of the offense and because it failed to provide sufficient facts to inform the petitioner of the nature and cause of the charges

against him or to permit him to raise double jeopardy as a defense to a subsequent prosecution.

2. The trial court erred in accepting the petitioner's involuntary guilty plea at a hastily convened plea hearing.

3. The trial court erred and abused its discretion by denying the petitioner's two presentence motions to withdraw his involuntary guilty plea.

The petitioner's direct appeal was refused on March 23, 2000.

## C. Petitioner's State Habeas Proceedings

On October 10, 2000, the petitioner filed a *pro se* petition for state post-conviction relief in the Circuit Court of Ohio County. In the petition, the petitioner asserted the following grounds for relief:

1. Ineffective assistance of counsel;

2. Count 52 of the indictment was constitutionally defective for not naming the alleged victims, times, dates, places, or circumstances of the crime charged and could not put the petitioner on notice nor protect him from double jeopardy;

3. The court erred by not allowing the petitioner to withdraw his guilty plea;

4. The prosecution's use of paid 404(b) witnesses acted as a coercive inducement for the petitioner to accept the guilty plea;

5. The prosecution used over-charging and multiplicity in the indictment as a coercive inducement for petitioner to accept the proffered plea agreement;

6. The trial court acted with prejudice when it established bail of $500,000 after being informed the petitioner was indigent;

7.  The prosecution permitted police officials to conduct illegal activities such as illegal search and seizure, and issued subpoenas to act as discovery tools; and

8.  All of the above allegations taken together amount to cumulative error and violated the petitioner's right to a fair and impartial adjudication of his guilt or innocence.

The petitioner's state habeas petition was summarily dismissed on November 8, 2005.  The Petitioner appealed that decision to the WVSCA on January 26, 2006.[1]  The Court refused the petition on December 6, 2006.

## II.   Petitioner's Federal Habeas Proceedings

### A.   Petitioners' Federal Habeas Petition

The petitioner filed the instant petition on December 27, 2006.  In his federal habeas petition, the petitioner raises the following grounds for relief:

1.  The trial court erred by accepting a guilty plea five days after ordering a competency exam thereby causing involuntary plea;

2.  Petitioner denied right to be fully informed when indictment lacked names of victim(s) and dates/double jeopardy;

3.  Trial court failed to render findings of fact and conclusions of law on each ground raised in the petition; and

---

[1] On appeal, the petitioner asserted the following assignments of error:
1.  Denied right to due process when the trial court accepted his guilty plea only five days after ordering the petitioner undergo a competency hearing;
2.  Denied right to be fully and plainly informed in the indictment when such indictment lacked names of victim and times and places necessary to properly prepare a defense and the indictment does not bar the petitioner from raising a double jeopardy claim;
3.  Denied due process because trial court failed to render findings of facts and conclusions of law in denying his state habeas petition; and
4.  Cumulative effect.

4.  Cumulative error and faulty indictment caused plea to be accepted involuntarily.

## B.  The Respondent's Answer and Motion for Summary Judgment

In the answer, the respondent generally denies that any violation of the petitioner's rights occurred.  In addition, in the motion for summary judgment, the respondent asserts that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.  In support of his motion, the respondent asserts that the petitioner's claims are not cognizable on federal habeas review, that the petitioner has failed to state a claim upon which relief can be granted, and that the petitioner has failed to demonstrate that he is entitled to relief on any of his claims.

## C.  The Petitioner's Reply

In his reply, the petitioner reiterates the claims raised in the petition and provides some additional information in support of those claims.  For example, the petitioner asserts that while his outward appearance may have seemed normal at his plea hearing, he was unable to retain information.  Moreover, the petitioner asserts that since the time of his state habeas proceedings, he has discovered a printing from Merck & Co., the manufacturer of synthroid, which states the following with regard to undermedication:

> The pulse may slow, the palms and soles appear slightly orange, and the side part of the eyebrows slowly fall out.  Some people, especially older people, may appear confused, forgetful, or demented – signs that can easily be mistaken for Alzheimer's disease or other forms of dementia.
> If untreated, hypothyroidism can eventually cause anemia, a low body temperature, and heart failure.  This situation may progress to confusion, stupor, or coma, a life-threatening complication in which breathing slow, the person has seizures, and blood flow to the brain decreases . . .

Reply (dckt. 20) at 5.

In addition, the petitioner notes that at the time of the plea hearing, it was also mentioned that

5

he suffers from Bradycardia, a slowing of the heart rate, brought on by lack of and underdosage of thyroid medication. The petitioner asserts that his medical records from the North Central Regional Jail also show that he was in distress at the time of the plea. The petitioner also asks the Court to consider the affidavit of Leroy Brown, attached to the petition, in which Mr. Brown states that the petitioner was not responsive and talked off the wall around the time of the plea hearing, but that after the petitioner's return to the North Central Regional Jail, the petitioner was sharp and attentive, noticeably different.

The petitioner further argues that his challenge to the sufficiency of the indictment is not waivable if his plea was not knowingly and intelligently entered. The petitioner seemingly concedes then that ground two is contingent upon whether or not his plea was knowing and voluntary. However, the petitioner also argues that a Bill of Particulars cannot cure a defective indictment and the trial court lacked jurisdiction to accept the plea.

The petitioner makes supplemental arguments as to his other claims as well, and notes that he believes counsel was ineffective, but has not raised such issue because it will only cloud the other issues. The petitioner then asserts that there was a vast conspiracy between his attorney, the state prosecutor, the United States Attorney's Office and the police to convict him.

The petitioner also cites to the transcripts of the plea hearing in support of his claims. The petitioner asserts such passages establish that he was coerced into taking the plea agreement and that he was in fact, incompetent at the time of the plea. The petitioner argues that instead of relying on the statements of counsel, the court should have heard expert testimony to establish whether or not he was competent at the time of the plea.

Next, the petitioner argues that counsel was not ready for the withdrawal hearing because

crucial records had not yet been obtained. The petitioner asserts that counsel was "flying by the seat of his pants" and pushed forward the wrong basis for the incompetence claim. For these reasons, the petitioner asserts that he is entitled to an evidentiary hearing with expert medical witnesses to testify to the effects of his undermedication.

The petitioner then goes into a lengthy recitation of his testimony at the hearing on his motion to withdrawal guilty plea. The petitioner believes the record shows that counsel was unprepared to argue the motion and that counsel failed to properly investigate his claims.

Moreover, the petitioner asserts that the trial court did not establish an adequate factual basis for the acceptance of his plea because no names were read into the record, the victims were merely identified as "juveniles." The petitioner then asserts that the respondent has attempted to "sever" his claims into individual claims. However, the petitioner asserts that the issues are interwoven and the entire record must be examined as a whole. The petitioner believes he was rushed into a plea hearing before his competency could be appropriately assessed.

The petitioner also takes issue with the stenography of his plea hearing and that of his withdrawal hearing. The petitioner asserts that the stenographer at the motion hearing included pauses, while the stenographer at the plea hearing did not.

The petitioner asserts that the trial judge improperly relied upon the "testimony" of defense counsel and the prosecution instead of obtaining expert medical opinions to determine whether the petitioner was incompetent to enter his plea.

The petitioner then goes on to explain in more detail the basis for his double jeopardy claim.

**D.   The Respondent's Response**

In response to the petitioner's reply, the respondent notes that the petitioner has expanded

his claims of incompetence and included several cites to the transcript of the hearing on his motion to withdraw guilty plea. Therefore, the respondent has supplemented the record with the transcript of that hearing. Additionally, the respondent notes that the trial court made findings of fact with regard to the petitioner's competence as a result of that hearing. Therefore, the respondent reiterates its position that factual determinations made by the state court are entitled to deference. Furthermore, with regard to the competency issue in this case, the respondent argues the United States Supreme Court has recognized that additional deference is due the state court because the state court not only considered the factual evidence, but had the opportunity to observe the demeanor of the witnesses. Thus, the respondent argues that the petitioner has failed to meet his burden of proof and his claim of incompetency should be denied.

### III.   Standards of Review

#### A.   Summary Judgment

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 (1977). So too has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla

of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather then encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-588 (1986).

**B.    Federal Habeas Review Under 28 U.S.C. § 2254**

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper. Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Regardless, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). However, the federal court may not grant habeas relief unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States;

or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2); <u>see also</u> <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." <u>Thomas v. Taylor</u>, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. <u>Bell v. Jarvis</u>, 236 F.3d 149 (4th Cir.), <u>cert.</u> <u>denied</u>, 524 U.S. 830 (2001)(quoting <u>Bacon v. Lee</u>, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Id.</u> at 158.

A federal habeas court may grant relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently that this Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> "An unreasonable application of federal law is different from an incorrect application of federal law." <u>Id.</u> at 410.

When a petitioner challenges the factual determination made by a state court, "federal habeas

relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the facts.'" 28 U.S. C. § 2254(d)(2). In reviewing a state court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

However, habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, supra.

Here, the petitioner's claims were properly presented to the courts of the State. Because the petitioner's claims were adjudicated on the merits in State court, the State's findings of fact and conclusions of law are due the appropriate deference.

## IV. Analysis

### A. Knowing and Voluntariness of Plea

In this ground, the petitioner asserts that he was denied medication for 28 days prior to his plea hearing. The petitioner asserts that the lack of medication rendered him incompetent. In support of this claim, the petitioner asserts that he was indicted on 52 counts in the September 1998 term of the Ohio County Grand Jury. On November 12, 1998, defense counsel informed the trial court that the petitioner had expressed a suicidal ideation, but that in his opinion, a competency hearing was not necessary. Nonetheless, the court ordered that the petitioner undergo a competency

evaluation.

However, on November 17, 1998, only five days later, the trial court accepted the petitioner's plea to 14 counts of the indictment. The petitioner asserts that he subsequently made two motions to withdraw his plea, but that both motions were summarily denied.

With regard to the alleged lack of medication, the petitioner asserts that he was diagnosed with a thyroid condition in 1992, for which he was eventually prescribed the medication synthroid. After several adjustments, the petitioner started receiving a regular and consistent dosage of .150mg. The petitioner asserts that he received such dosage once a day for approximately six years.

On October 2, 1998, the petitioner surrendered to authorities in Wood County, West Virginia. At the time he surrendered, the petitioner asserts that he handed jail authorities a bottle containing his synthroid medication. The petitioner asserts that no dosages were ever given to him while at the Wood County Jail.

On October 4, 1998, the petitioner was transferred from the Wood County Jail to the Northern Regional Jail by representatives of the Ohio County Sheriff's Department. The petitioner asserts that because he was not given any of his synthroid at the Northern Regional Jail, he filed numerous complaints. As a result, the petitioner was seen by a jail supervisor who ordered the petitioner be seen by medical personnel. On October 20, 1998, the petitioner was allegedly placed in the hospital ward at the Northern Regional Jail with symptoms of hypothyroidism. On October 23, 1998, the petitioner received a blood test which allegedly showed that he suffered from thyroid hormone sensitivity. Consequently, the petitioner was given his synthroid medication, but in a reduced dosage (.10mg).

Less than one month later, on November 17, 1998, and while still on the reduced dosage, the

petitioner asserts that he entered his plea of guilty. The petitioner asserts that the lack of medication from October 2 through October 23, and the reduced dosage thereafter, rendered him confused, disoriented and having difficulty with his memory. Thus, the petitioner asserts that he was mentally incapacitated at the time of his plea. He therefore believes that his plea was not knowing and voluntary, and that it should be withdrawn.

In order for the court to find that the defendant is competent to stand trial the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960).

"A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. Godinez v. Moran, 509 U.S. 389, 400 (1993). To sustain a claim of incompetence to plead guilty, the defendant must demonstrate that 'his mental faculties were so impaired . . . when he pleaded that he was incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights and of realizing the consequences of the plea." United States v. Truglio, 493 F.2d 574, 578 (4th Cir. 1974).

With regard to this issue, the state court found:

> Certainly one might say that the easiest decision to make here is simply to permit the plea to be withdrawn and let's proceed on with trial. Not a substantial amount of time has elapsed from the time - matter of fact, I think we're still in the same term. And another person may also look at it to say that if we don't do that and the plea is permitted to continue, conceivably, we would be wasting valuable

time ultimately, there is always the possibility that the Supreme Court could examine this issue to determine whether or not the plea should have been withdrawn . . . You say, [w]ell, that may not be for a year, year-and-a-half down the road.

So those are elements that you consider in maybe taking what may be considered an easy way out. But I don't believe the easy way out in this case is the answer because, quite frankly, I think that at the time the plea was entered, Mr. Williams knew what he was doing, that it was knowingly, that it was intelligently and it was voluntarily entered.

The record is replete with - and I'm not going to go through the entire record. It's been typed, prepared by this court's official court reporter whose competence, in the judgment of this Court, is beyond reproach. But there is what I call - there is a very lengthy colloquy, and that probably is an understatement. But there is a question that I consider kind of a zipper question that ties it all, on page thirty-eight, line twenty-one:

> "THE COURT: All right. Let me ask you one last time: Do you have any reservations whatsoever as we sit here today in entering into this Plea Agreement?
> THE DEFENDANT: No."

And that is done without pause, without reservation. As a matter of fact, as the record reveals, the one area that Mr. Williams was concerned about was whether or not there would be proper monitoring to make sure that the Plea Agreement was actually enforced. He indicated he was satisfied that Mr. Herndon would do that, to shepherd this agreement through to conclusion. He commented, I believe, that this Court would serve in that same role.

And to now sit back and simply permit this plea to be withdrawn simply because Mr. Williams has, basically, had a change of heart. And I don't know what is motivating Mr. Williams, whether or not what he said to Ms. Senkbeil as to his motivation is or is not the reason. I'm not that cynical at this point, don't have to be, to suggest that there is some hidden agenda. Because the entire decision as to whether or not to permit this Plea Agreement to continue is contained within the four corners of what happened on the seventeenth of November.

I'm satisfied that the plea was voluntary. I'm satisfied that the plea was entered after Mr. Williams was fully apprised of all of the consequences of entering the plea. I'm satisfied that he was mentally capable of understanding what was going on and intelligently responded. And that he did have more than sufficient information upon which a decision as to whether or not to enter the plea should be entered.

The one thing that was rather impressive to this Court during that colloquy was Mr. Williams doesn't remember now, disavows that he used the word "oration". (sic) But it's exactly what it was. I couldn't have picked a better word. Mr. Herndon got up and started, on line eight on page twenty-three of the transcript and, without pause, ended on line twenty-four on page twenty-eight, as to - from beginning to end.

I recall during the presentation that there's nothing really more for me to do. I don't have to probe any further other than to ask whether or not Mr. Williams agreed with what was stated. And there was some reservation[, but] again, the zipper question was:

> "All right. But, overall, do you agree with what he just stated?"
> Answer: Yes."

The interesting thing about this, and the very competent court reporter, at certain times during the colloquy, there were pauses. Mr. Williams was reflecting, as he said he had to do as a result of possibly the reduction in the dosage as far as medication. And those pauses are in this record.

Then you come down to possibly, with all things being balanced, that the plea was knowingly, intelligently, and voluntarily entered, what harm would there be to the State if we simply said, All right. Let's put a jury in the box and let's try Mr. Williams?

In some cases, I would truly say there shouldn't be any. The State has the case, let's go through with it. And this Court has said it's ready and is always available to try cases. That's what we do.

But we have another element in this case. We always are concerned in every case about the victims. And they have rights. They're not to the exclusion of the rights of the Defendant, but they are certainly complementary . . .

But the underlying reason that it would spare the victims from having to appear, despite what prophylactic measure could be taken to protect these witnesses. And we could, there are always ways to do that. Still it may - and was represented to me a rather traumatic experience. So that was avoided.

Now to say, [a]ll right, just when you think it's safe to go back and go on with a normal life, you're going to have to do it again. What's to say, after we do that, that there won't be another attempt to then enter a plea? . . . [T]here's no absolute right under the West Virginia or United States Constitution to enter a plea. Nonetheless, we could be doing this now for the next six months.

It's not right. It's got to stop. And it's got to stop because there was a properly entered plea. So when you assess the Motion . . ., this Court is of the view, and concludes that there has

been no fair and just reasons established to permit the plea to be withdrawn. To the contrary, there are fair and just reasons to permit the plea to remain, to stand as entered. And the . . . Motion for Leave to Withdraw the Plea will be denied for the reasons stated, based on those findings and conclusions.

Resp't Ex. 12 at 61-65.

Upon an independent review of the record, the undersigned finds that the state court's adjudication of ground one was not contrary to clearly established federal law. Additionally, in light of the evidence presented in the state court proceedings, the undersigned does not believe that the state court's adjudication of the petitioner's claims involved an unreasonable application of clearly established federal law, nor do the state court's findings result in a decision that is based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

At the time of the plea hearing, the trial court was fully informed that the petitioner was allegedly not being given appropriate doses of his medication. Resp't Ex. 10 at 4. The trial court asked the petitioner what effect, if any, the reduced dosages had. Id. The petitioner asserted that the reduced dosage made it difficult to make split-second decisions. Id. When asked it he could make a clear and voluntary decision if given the opportunity to think about it, the petitioner replied, "comprehensively." Id. at 4-5. To further clarify, the court asked: "it just takes a little longer; is that correct?' Id. The petitioner replied: "[t]here's a little bit of a lag." Id. The petitioner never mentioned any confusion, disorientation or other mental incapacities.

Directly thereafter, the Court inquired as to whether the petitioner had the opportunity to go over the plea agreement with defense counsel. Id. at 5-6. The petitioner replied affirmatively. In fact, the petitioner stated that he had discussed the plea agreement with defense counsel on more

than one occasion. Id. The court then confirmed that it was the petitioner's desire to enter into the

plea agreement. Id. at 6. The petitioner stated that it was. The Court asked the petitioner if he had

enough time to think about the agreement, digest it, and make a decision. Id. The petitioner stated

that he did. To further clarify, the court specifically asked the petitioner whether the lower dosage

of medication impaired his ability to make a decision. Id. at 7. After some discussion,[2] the

petitioner stated that he wanted to enter into the agreement. Id.

The plea agreement was then explained to the petitioner and he was asked if he understood

everything that was said. The petitioner stated that he did. Id. at 15. Moreover, the petitioner

discussed areas of the agreement to which he had reservations. Id. at 15-16. After explaining and

discussing the petitioner's reservations, the court said:

> One thing that I want to be very, very sure about, and I want
> you to understand, is that if you do not enter into this Agreement,
> you're not in any way going to offend me. I don't want you to do it
> unless it's something that is done voluntarily and intelligently and of
> your own free will. You're not going to curry favor or disfavor with
> me if you enter into it or do not enter into it.

Id. at 16-17. After further discussion of the petitioner's reservations, the petitioner stated: "I want

to take the agreement." Id. at 17.

Next, the court noted that an issue of competency had recently been raised by defense

counsel in this case. Id. at 19. Therefore, the court inquired with defense counsel as to whether or

---

[2] Specifically, the Court stated:
 "I want to give you the time to do it because, Mr. Williams, I want to be sure - and we'll take as
long as we need to. We're in no hurry. This is not "Beat the Clock." This is an extremely important
event, as you can well imagine. And I want to be very sure that you fully understand what is going on
and every decision that you make is an intelligent decision and is a voluntary decision.
 So therefore, if you feel that you've not had enough time to think about it because of this lower
dosage or for any other reason, just let me know and I'll give you as much time as you want, sir." Resp't
Ex. 10 at 7.

not he opposed the plea agreement or whether there was any reason why the court should not continue to accepting the plea. Id. at 19-20. Defense counsel stated that he did not. Id. at 20.

With regard to the prior order for a competency evaluation, defense counsel stated:

> Had I personally believed that Mr. Williams were not competent to cooperate with counsel[,] to enter the plea agreement and to face trial if he elected to face trial, I would have moved . . . for evaluation by a psychologist and a psychiatrist to determine his competency.
> I merely apprised the Court . . . of the issue . . . to make sure that the process is as perfect as possible. So if the Court would, the Court should consider this as being a paranoid, extra precaution on my part, rather than a real concern on part.
> I can advise the Court that competency is not a real concern on my part.

Id. at 20.

The court then asked the petitioner if he had ever been treated for any other medical problems, to which the petitioner advised the court that he had some treatment for dissociation. Id. at 21. The petitioner explained:

> dissociation is brought on by extreme stress or trauma. It's likened to post traumatic stress disorder. When the level of stress or trauma becomes too great, the personality, the mind splits. One section will run the show and the other section will go into hiding and will remain there until the trauma level is decreased sufficiently to allow the mind to come back is one account.

Id. at 22. The petitioner then explained that he had a five-year memory gap from 1972 - 1977, due to the dissociation. Id. at 23. When questioned, defense counsel offered the following:

> Your Honor, I first became aware of this issue in addressing bail as part of my interviews with Mr. Williams during the bail hearings . . . At times during the interview [the petitioner] was able to provide information that was complete with respect to all . . . areas of inquiry. The time period nineteen seventy-two to nineteen seventy-seven, at different times he was able to provide me with information about what he was doing during that time period, but at

not (sic) time was he able to provide me with information about everything he was doing at that time period.

To say it in perhaps a more useful manner, at one o'clock he might be able to tell me where he was employed during that time period, but not where he lived. At two o'clock, he might remember where he lived, but not where he was employed . . .

In addition, my understanding of the diagnosis was not a diagnosis, but a suggestion of dissociative memory disorder rather than an actual finding.

I have monitored Mr. Williams' interactions with me quite closely during my representation of him, knowing that there might be a psychological issue with respect to competency. A first assessment that I made was whether or not Mr. Williams knew who he was, where he was, the situation that he was in. That was that he was faced with a large number of very serious allegations and what the nature of those particular allegations were. I then provided him with about an hour-and-a-half synopsis that I told him how it works and how the court system works and during that synopsis, I would stop from time to time at significant areas and ask Mr. Williams to tell me what he thought that meant. And he was able to explain eloquently to me how the court system worked after I had explained it to him, and repeat that at later dates at other inquiries.

As I progressed and as we became more aware of what the evidence was and what the defenses were, I provided Mr. Williams with both oral and written appreciations of his situation which I laid out the tremendous number of suppression issues that were presented by this particular case. I gave him the legal basis for each of the suppression motions, the factual basis for each of the suppression motions and asked him to provide me, first, with his understanding of what the legal basis was, to provide me with the factual basis that I might use in his particular defense with respect to the suppression issues . . .

During that same time period, I was asking about bail and was asking about his whereabout during the time period from September twelfth until his ultimate arrest. Mr. Williams was able to provide me with a factual basis by which I could address the searches. He was able to place them in sequence. He was able to advise me what was seized in each search. He sui (sic) sponte, provided me with information about materials that were seized that were not on the property receipt for the searches, so that I was able to analyze the documents that had been provided to him against a recall of the matter that were actually seized, and could tell me that he remembered that there were matters seized in the search that did not appear on the property receipt. In fact, I had identified some of those

matters in a Motion to Suppress on July thirty-first, nineteen ninety-eight.

Later, he was able to provide me with circumstantial detail about his whereabouts. The circumstantial detail of time conflicted but it did not appear to be an issue addressing competency on which the circumstantial detail conflicted. With respect to the statements, he was able to provide me with circumstantial detail about his interactions with [the police], including describing the personnel, the substance of the interactions, the substance of the statements made by the officers, the substance of the statements that he made and was able to recall the process as well: whether he had or had not been Mirandized; whether he had or had not been told that he was under arrest; whether he had or had not been told that he was free to leave.

As the discovery process continued, we began to discover more information that the State had acquired, primarily as part of the search, and Mr. Williams was able to place that discovery within the context of his entire life and to suggest to me that there were other materials that might be helpful to his defense that I would want to acquire form the State that the State had seized . . .

When we talked about financial records, he was able to recall financial records, what financial records there were that would be helpful, what financial records there were that would be harmful. He was able to provide me with certain medical information that might provide useful impeachment evidence and also might provide useful defenses to some of the allegations.

When we got the draft of particulars, Mr. Williams was able to analyze the draft of particulars by individual alleged victims to the extent that we have dates. He was able to provide me with people who can provide alibis, with names and addresses, with records that would provide alibis for some of the names and dates and to advise me where I might find those particular records. And those records consisted of different types of records at different locations . . .

And he addressed specific time frames and specific dates . . .

As we were doing that, of course, the plea process was going on. I would estimate that I probably spent, in the last ten days, more than fifteen, and under twenty-five hours with Mr. Williams, going over the plea process. As far as today, our interactions started around noon today and continued to just before two o'clock, to give the Court some idea.

As we looked at the plea process, I felt it was important for Mr. Williams to understand what his defenses were, what the legal defenses were, what the factual defenses were, and what the facts were as we knew them from the discovery that we had had to date, and from the Bill of Particulars were. And that he received some

prediction as to what his chances of success were with the legal issues, the factual issues, the trial by jury and should he not prevail, what the sentencing alternatives were and what his chances on appeal on any particular issues were.

This is not a simple communication to make a client. It takes some time, it takes some sophistication on the client's part and some lack of sophistication on the attorney's part. And in this particular instance, I didn't find it necessary to dumb it down to Mr. Williams. When I explained the analysis to Mr. Williams, he was able to go with some clarity to the center issue with respect to each particular issue.

With respect to the first search, we're looking at whether or not it asserts a crime has been prevented. He was able to focus on that, to identify it and to understand the process by which the Court would come to a conclusion, what the results would be if he prevailed no (sic) that suppression motion, what the results would be if he did not prevail on that suppression motion and what the chances were on appeal . . . And Mr. Williams was able to understand those and to express his understanding to me in an analysis that made sense, that indicated that he knew what the issue was and what he was facing at that particular time.

The same thing was true with respect to the Plea Agreement and the possible consequences with the Plea Agreement. It is a complicated plea, it involves pleas in two courts. Again, I didn't have to dumb it down for Mr. Williams. He understood the pitfalls of the Plea Agreement. He understood the problems that might arise. He understood the benefits to be derived. He understood benefits that might be derived in terms of federal versus state placement that I was not aware of and he was able to enunciate those to me.

So when one looks at competency, Mr. Williams probably has exhibited to me more competency, more understanding, and more ability to cooperate with me than the average client. In fact, he's in the top ten percentile of people who understand what's going on, who know what factors are necessary to analyze to come to a decision and who thinks about it and he thinks about it. In fact, he over thninks (sic) about it, and we've gone over these issues time and time again, until I'm certain that he more than understands. And from time to time, I've gotten impatient with him for going in circular discussions about the same issues. But as we've made the circular discussion, it's been quite clear to me that he understands the process and understands his present situation.

He can cooperate with me. He can go to trial. He can make a decision to go to trial. He can make a decision to enter into this plea. I'm not the least bit concerned about his competency to stand

trial or his competency to enter into the plea, your Honor.

Id. at -28.

After this lengthy discussion of counsel's interaction with the petitioner, the petitioner was asked if he agreed with what counsel had said. Although the petitioner stated that he did not remember telling counsel some of what counsel alleged, the petitioner generally agreed with counsel's statement. Id. at 29.

The court next notified the petitioner of his rights and of those rights which he would be giving up by pleading guilty. The petitioner stated that he understood. Id. at 31. The petitioner stated that he would like to proceed on the agreement and the court then asked if the petitioner's agreement was knowing, intelligent and voluntary. Id. at 32. Without hesitation,[3] the petitioner said yes. Id. The petitioner later stated: "I'm aware of what's happening here." Id. at 33.

Finally, the petitioner was asked, point blank, "[d]o you have any reservations whatsoever as we sit here today in entering into this plea agreement?" Id. at 38. The petitioner stated no. Id. Thereafter, the charges were read and the petitioner pleaded guilty to each charge stipulated in the plea agreement.

Additionally, at the hearing on the petitioner's motion to withdraw, there was testimony by the petitioner's neighbor, Jean Senkbeil, that she visited the petitioner in jail several times and that they had discussed his plea agreement and his motion to withdraw that agreement. Resp't Ex. 12 at 49. Ms. Senkbeil further testified that the petitioner told her his motive for filing the motion to withdraw. Id. at 49-50. According to Ms. Senkbeil, the petitioner told her that "if he kept it up long enough, that [maybe] they would reduce [his] sentence." Id. at 50. Ms. Senkbeil also testified that

---

[3] At various times throughout the plea hearing, the court reporter notes instances in which the petitioner pauses to think before answering.

she had known the petitioner for thirteen years and that they have had many conversations during that time.  Id. at 53.  Ms. Senkbeil then stated that during her five or six visits to the jail, the petitioner's mental abilities and ability to communicate were no different from what they had been during the thirteen years she knew him.  Id.

In this case the petitioner's claim that his plea was not knowing and voluntary is clearly refuted by the record.  The petitioner informed the court of the alleged underdosage of medication and the court went to great lengths to insure that the petitioner understood the plea agreement and the proceedings.  The petitioner was questioned several times as to his desires and each time he stated he knowingly and voluntarily wanted to entering into the plea agreement.  "Absent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy."  Fields v. Attorney Gen. of Maryland, 956 F.2d 1290, 1299 (4th Cir.), cert. denied, 506 U.S. 885 (1992).  And, "findings by a sentencing court in accepting a plea 'constitute a formidable barrier' to attacking the plea." United States v. Lambey, 949 F. 2d 133, 137 (4th Cir. 1991) (quoting Blackledge v. Allison, 431 U.S. 63, 73-74 (1977)).  The petitioner was able to discuss the terms of the plea agreement with the court, and in fact, corrected the court on one occasion for failing to mention that the plea contemplated no fine being imposed.

Moreover, at the hearing on his motion to withdraw, the state introduced evidence that the petitioner's claims of incompetence and wish to withdraw the plea were simply a ploy to get a lower sentence.  It is clear that the state court carefully considered the petitioner's claim that his plea should have been withdrawn and the petitioner has failed to provide sufficient evidence to show that the state court's denial of that claim was erroneous.  See Maggio v. Fulford, 462 U.S. 111, 117 (1983) (quoting United States v. Oregon Medical Society, 343 U.S. 326, 339 (1952)) ("Face to face

with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth . . . 'how can we say the judge is wrong? We never saw the witnesses . . . '" Accordingly, ground one should be denied.

**B.  Sufficiency of Indictment**

In this ground, the petitioner asserts that the indictment lacked any names of the alleged victims or dates in specifics to bar this petitioner from raising a double jeopardy claim and denied specifics to prepare a defense. The petitioner further asserts that the indictment charged lesser included offenses and was not specific to bar raising the issue of continuing acts or multiple charging for the same act.

"It is well-established that a voluntary and intelligent guilty plea forecloses federal collateral review of allegations of antecedent constitutional deprivations. Once judgment on a plea is final, collateral  inquiry is limited to whether the plea itself was counseled and voluntary." Fields v. Attorney General of the State of Maryland, 956 F.2d 1290, 1294-1295 (4th Cir. 1992) (internal citations omitted). In other words, "[w]hen a criminal defendant has solemnly admitted in open court that he is fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not [competent]." Tollett v. Henderson, 411 U.S. 258, 267 (1973). The petitioner's guilty plea therefore forecloses his claim that the indictment was deficient.

Moreover, as to the petitioner's double jeopardy claim, that claim is waived. Double

jeopardy is a personal right which if not affirmatively pleaded at the time of trial will be regarded as waived. United States v. Buonomo, 441 F.2d 922, 924 (7th Cir. 1971). Accordingly, the petitioner's double jeopardy claim should also be denied.

**C.** **Failure to Render Findings of Fact and Conclusions of Law**

W.Va.Code §53-4A-7(c) requires a West Virginia court denying a request for habeas relief to enter a written order, "mak[ing] specific findings of fact and conclusions of law relating to each contention or contentions and grounds (in fact or law) advanced . . . clearly stat[ing] the grounds upon which the matter was determined, and . . . stat[ing] whether a federal and/or state right was presented and decided."

Open a review of the circuit court's Order denying petitioner state habeas relief, the undersigned finds that the court clearly fulfilled its statutory obligation in this regard. In the Final Order Denying Petition for Writ of Habeas Corpus, the circuit court concluded that the grounds for relief asserted by the petitioner had previously been adjudicated or waived. Relying on its prior decisions, the Court summarily denied the petitioner's claims.

However, even assuming *arguendo* that the memorandum opinion and order varied from the norm, based upon a strict reading of the code provision, this Court finds that any discrepancy associated therewith does not rise to the level of a constitutional violation. See 28 U.S.C. § 2254(a) ("a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States")(emphasis added); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (it is not the province of a federal habeas court to "reexamine state-court determinations on state-law questions"); Weeks v. Angelone, 176 F.3d 249, 262 (4th Cir.

1999) (questions of state laws and statutes are not cognizable on federal habeas review).

**D.   Cumulative Error**

In this ground, the petitioner asserts that the cumulative effect of all of the above-mentioned errors led to the acceptance of an unknowing and involuntary plea.  The petitioner further asserts that the effect of such errors was so egregious as to violate his right to a fair trial.

Although the Court recognizes that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error" and that "[t]he purpose of a cumulative-error analysis is to address that possibility," United States v. Rivera, 900 F. 2d 1462, 1469 (10th Cir. 1990), a  "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error."  Fisher v. Angelone, 163 F.3d 835, 853 n. 9 (4th Cir. 1998).  In this case, being that the Court has not found any individual constitutional errors, a cumulative-error analysis is neither necessary nor appropriate.

**V.   Recommendation**

For the reasons set forth in this Opinion, it is recommended that the respondent's Motion for Summary Judgment (dckt. 16) be **GRANTED** and the petitioner's § 2254 petition be **DENIED** on the merits and **DISMISSED WITH PREJUDICE**.

Within ten (10) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections.  A copy of any  objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge.  Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S.

140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket. The Clerk is further directed to provide copies of this Opinion/Report and Recommendation to all counsel of record via electronic means.

DATED: February 29, 2008.

*John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE